MEMPHIS NEWS PUB. CO. *v.* SOUTHERN RY. CO. *et al..*

(*Jackson.* April Term, 1903.)

1. **COMMON CARRIERS..** Criterion ordinarily determining who
   are.

The criterion by which it is generally determined whether one is
a *common carrier* is that he has held himself out, or has ad-
vertised himself in his dealings or course of business with the
public, as being ready and willing for hire to carry particular
classes of goods for all those who may desire the transporta-
tion of such goods between places between which he professes
in this manner his readiness and willingness to carry. If he
does so, he is regarded in law as a common carrier; but if not,
he wil lbe treated as a private carrier for hire. (*Post, p.* 700.)

2. **SAME.** Same. Not a universal test, exceptional cases.

The rule above stated, however, it has been held, is not a univer-
sal test. There are exceptional cases where a party has im-
posed upon him the character of a common carrier, though it
may be that he has not given the public to understand that this
was his profession, but, receiving pay for services, he has on
occasional, or in particular instances, carried freight; and in
such cases it has been held that such a party *pro hac vice*
assumed the responsibilities of a common carrier. (*Post, pp.*
700-701.)

Cases cited: Moss v. Bettis, 4 Heisk., 661; Gordon v. Hutchinson,
1 Watts and S., 285.

3. **SAME.** Commercial railroads are, and duties of.

Commercial railroad companies are by their very nature and or-
ganic character common carriers. As public utilities, as well as
private enterprises, there have been conferred on such companies
extensive rights and franchises, such as the right to invoke the

News Pub. Co. v. Southern Ry. Co.

power of eminent domain, and they have imposed on them duties which they can not avoid, one of which is that they shall serve the public without unjust discrimination, and they are held strictly to the discharge of their common law and statutory duties. (*Post, pp.* 701-702.)

4. **SAME. Same. Shall not discriminate between persons in like condition.**

It is the duty of a railroad company, as a common carrier, to deal fairly and impartially with all who seek, either as passengers or shippers of freight, to avail themselves of its services. By the grant of its franchises it has a trust to the public imposed upon it, which can only be discharged by extending equal facilities to each member constituting the public; and any contract made by a common carrier by which it discriminates between individuals in like conditions, giving to one an advantage in the carriage of his person or property, which it refuses to another, or by which the interests of one or more persons of a class are fostered at the expense of another member of the same class demanding like services, is illegal and unenforceable. (*Post, p.* 702.)

5. **SAME. Same. Same. No discrimination either in time or order of shipment; due diligence in delivery.**

Where goods not dangerous in their nature and not unfit for shipment are offered at a particular place and time, and the cost of carriage is tendered, a common carrier, having facilities for shipment, must accept and transport such goods, and in doing so it can show no favor, nor make distinctions which will give one employer an advantage over another, either in time or order of shipment, or in the distance of the carriage, or in the convenience or accommodation which may be afforded; and it is bound to use due diligence in the delivery of the goods. (*Post, pp.* 702-703, 710.)

Cases cited: N. & C. R. R. Co. v. Jackson, 6 Heisk., 271; New Eng. Ex. Co. v. Maine Cent. R R. Co., 57 Me., 188; Messenger v. Penn.

R. R. C., 36 N. J. Law, 407; Union Pac. Ry. Co. v. Goodridge, 149 U. S., 680.

**6.  SAME.  May become private carrier, when.**

A common carrier may become a private carrier or bailee for hire, when as a matter of accommodation or by special agreement he undertakes to carry something which it is not his business to carry.  (*Post, p.* 703.)

**7.  SAME.  Special contract does not divest responsibility, when.**
But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the purpose of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, it is a common carrier, and a special contract in respect of its responsibility does not divest it of its character, nor absolve it from its duties as such carrier.  (*Post, p.* 703.)

Case cited:  N. Y. C. R. R. Co. v. Lockwood, 17 Wall., 357.

**8.  SAME.  Inhibition against preferential indulgences extend to what services.**
Save as to those duties which he owes to the public, a common carrier has complete dominion over his property and the inhibition against preferential indulgences extends only to those services which inhere in or pertain to the business of a common carrier, and beyond these, he is entitled to as absolute control and as complete dominion over his property, whatever it may be, as is every other owner, and may therefore exclude from or admit to it, at his will, particular persons.  (*Post, p.* 706-709.)

Cases cited:  Barney v. Oyster Bay, etc., Co., 67 N. Y., 301; Fluker v. Ga. R. R. Co., 81 Ga., 461; Smith v. New York R. R. Co., 149 N. Y., 249; N. & W. R. R. Co. v. Old Dominion Bag Co., 99 Va., 111; Audenried v. Philadelphia & R. R. R. Co., 68 Pa., 370; Hoover v. Pa. R. R. Co., 156 Pa., 220.

News Pub. Co. v. Southern Ry. Co.

**9.  SAME.**  Unlawful discrimination by, under cover of special contract; remedy against.  Case in judgment.

Defendant railway company contracted with defendant Commercial Publishing Company, agreeing to run a special early morning train, carrying only the nawspapers of said publisher, in consideration of said publishing company guaranteeing to it certain revenue from the operation of the train.  This train became one of its schedule trains and was advertised as such, and was controlled exclusively by the railway company, which received all the revenues derived from the operation of said train, both in the carrying of passengers and freight.

Complainant, publishing the Memphis Morning News, demanded of defendant railway company the right to ship as freight its packages of newspapers to its several agents at various stations along the line of railway where the train was scheduled to stop, and tendered the usual charges on the same; but said defendant refused to transport said newspapers, alleging as grounds of its refusal, the obligations of its contract with defendant Commercial Publishing Company.  Complainant then tendered to defendant railway company a bond with proper security, in consideration of it being allowed to ship its newspapers as freight on the train, by which it undertook to indemnify said railway company against all loss resulting from the operation of the train up to one hundred and twenty-five dollars for each round trip, which was the amount guaranteed by defendant Commercial Publishing Company.  This tender was declined.  The bill in this case was filed to the end that the rights of complainant in the premises might be ascertained and established, and praying that an injunction be awarded restraining defendant railway company as a common carrier from discriminating in favor of the defendant Commercial Publishing Company as charged, and for a mandatory injunction requiring defendant railway company to accord to complainant the same privileges, upon the tender of freight charges and guaranties against loss as had been accorded defendant Commercial

Publishing Company. Defendant Commercial Publishing Company filed a cross bill charging, in substance, that the establishment of said early train service had entailed a loss on cross complainant, under its guaranty, of about seven thousand dollars in money paid by it to defendant railway company, and insisting that upon these facts said train was a chartered train on which the cross complainant alone was entitled to carry its newspapers and insisting that in any event before complainant should be let into an equal enjoyment of this train service for the carriage of its packages of newspapers that it should be only on condition that it reimburse cross complainant to the extent of one-half of the money expended by it in the establishment of said service. The cross bill was dismissed on demurrer, and on the hearing a final decree was entered in favor of complainant. The defendant Commercial Publishing Company appealed and assigned errors.

*Held*: 1. That defendant railway company was a common carrier and could not, relying on its contract with its codefendant, refuse to carry on the train in question the newspapers tendered to it by complainant, and such refusal constituted an illegal discrimination between persons in the same class.

2. That the early morning train was not a special train, chartered for a special purpose.

3. That it was the duty of the railway company to forward complainant's papers when tendered, without discrimination in time or order of shipment, and it could not refuse to carry said papers on the early morning train on the ground that it had other trains going out later in the day.

4. The cross complainant was not entitled to recover of complainant the amount of its outlay in establishing the early morning train service that it would be impracticable to state an account that would do equal justice between the parties; and, that if bound to contribute at all, complainant could only be required to

do so to the extent of its proportional part of said outlay; all other shippers who have availed themselves of said service being equally liable to contribution.

5. That defendant railway company was bound under its duty as a common carrier to transport any freight properly tendered to it, and neither the railway company nor its codefendant, Commercial Publishing Company, could impose as a condition of acceptance and delivery of the goods tendered, an obligation to share the burden of establishing the service voluntarily assumed by said defendant Commercial Publishing Company.

FROM SHELBY.

Appeal from the Chancery Court of Shelby county.— F. H. Heiskell, Chancellor.

G. T. Fitzhugh, for Memphis News Publishing Company.

F. P. Poston and Wright, Peters & Wright, for Southern Railway Company *et al.*

Mr. Chief Justice Beard delivered the opinion of the Court.

This is an injunction bill, filed by the complainant, a corporation organized under the laws of Tennessee,

against the Southern Railway Company, a corporation chartered by the State of Virginia, engaged in operating a line of railroad running between the cities of Memphis and Chattanooga, and the Commercial Publishing Company, a corporation with a charter issued under the authority of the State of Tennessee.   The first and third of these corporations are engaged in the publication and circulation of two daily newspapers, and have their situs in the city of Memphis, and the Southern Railway Company is a common carrier of freight and passengers between the termini mentioned.

The controversy arises out of a refusal upon the part of the railway company to receive and carry upon its train No. 6, scheduled to leave Memphis for Huntsville, Ala., each morning at 4:30 o'clock, packages containing newspapers published by the complainant company and put up for delivery at certain stations along the line of said railroad; the refusal being based upon the ground, alleged by the railway company, that by the terms of a contract already existing between it and the Commercial Publishing Company it was prohibited from carrying any other newspaper than such as was published by that company.

The facts, conceded in the pleadings or found in the agreed stipulation of counsel in the record, are, that the defendant, the Commercial Publishing Company, was on the 29th of November, 1901, and had been for years prior thereto, engaged in the publication daily of a newspaper called the "Commercial-Appeal," of wide circulation,

and especially with many subscribers living along the line of the railroad. At that time there was no early train service out of Memphis by which newspapers could be carried to points between that place and Huntsville, a point on the road situated in the State of Alabama. Conceiving the idea that the value of its newspaper would be largely enhanced by the establishment of such train, it entered into a contract with the Southern Railway Company, the terms of which, so far as it is necessary to state them, may be summarized as follows: (1) The railway company agreed to operate a passenger train, consisting of an engine, a combination passenger and baggage car, and at least one passenger coach, between Memphis and Huntsville, leaving Memphis about 4 a. m. daily, and reaching Huntsville at or about 10:40 a. m., and on its return trip departing from the latter place about 7:20 a. m. and arriving at Memphis about 2 p. m. (2) It agreed to forward upon said train all newspapers which the Commercial Publishing Company might desire to distribute between Memphis and Huntsville, and to transport upon such train daily also such employees of the Commercial Publishing Company as might be necessary to handle the same, and also to forward daily on a freight train such newspapers to points east of Huntsville; also to operate its own hand car or velocipede, at its own risk and expense, over its branch line to Somerville, Tenn., from the town of Moscow. (3) It further agreed to refuse, so far as it might lawfully do so without violating the postal laws, rules, and regu-

lations of the United States, to carry upon said train the newspaper or publication of any other publishing company; but other newspapers or publication were to be transported upon any other train or trains of the railway company except the one in question. (4) The contract further provided that the railway company might carry on said train all such passengers and their baggage, express matter, and other business usually accommodated upon passenger trains, as might be offered, upon such rates or terms as it might prescribe, and should retain all earnings and revenue derived from the operation of these trains. (5) It was also provided that the employees of the Commercial Publishing Company were to be under the exclusive control of the railway company, and amenable to the orders and instructions of its conductor, and to the reasonable rules and regulations of the carrier company.

In consideration of these undertakings on the part of the railway company, on its part the Commercial Publishing Company in this contract guaranteed to the railway company a revenue from the operation of this train of $125 for each one of the round trips contemplated by the contract, and agreed to pay the railway company the difference between the gross earnings of each of these trips and this sum. The Commercial Publishing Company further agreed to indemnify the railway company against all demands, suits, judgments, or sums of money accruing to the publishing company or any one or more of its employees and to protect it against any claims of

the employees of the publishing company and the cost of defending them, if suits were brought against it. In other words, the publishing company agreed to be responsible for all costs, demands, and claims growing out of the operation of the train and incurred in handling papers by and transporting employees of the publishing company.

It also undertook to publish daily a schedule time-card of the railway company in the Commercial-Appeal, as the same might be promulgated, with all changes and corrections therein, as might from time to time be made, and also to publish five hundred (500) inches of any advertising matter desired by the railway company, all of which should be done at the expense of the Commercial Publishing Company. The railway company, however, agreed to grant a reasonable amount of free transportation over its lines to the publishing company.

This contract took effect December 1, 1901, and was to continue until December 31, 1902, with the right of renewal for a further period of one year.

The train thus provided for was soon thereafter put in operation by the Southern Railway Company, and it is agreed in the cause that it was one of its scheduled trains, and was advertised to the public as such. It is also agreed that it was controlled exclusively by that company, that all of the revenue derived from its operation was its property, and that it carried passengers and their baggage, the United States mail, express matter,

newspapers of the Commercial Publishing Company, and all such other matter as is usually transported on passenger trains of a commercial railroad.

On the 4th of May, 1902, the complainant began in the city of Memphis the publication and issuance of a daily morning paper called the "Memphis Morning News," and immediately secured several thousand subscribers in the territory reached by this line of railroad. Desirous of reaching these subscribers at as early hour as possible, the complainant demanded the right to ship as freight its packages of newspapers, properly directed to its several agents at the various stations along the line of the railroad where the train was scheduled to stop, and tendered the usual charges on the same. This demand, however, was refused by the railway company, upon the ground that it was restrained from such carriage by the terms of its contract with the Commercial Publishing Company. Upon this refusal the complainant then tendered to the railroad company a bond, with proper security, undertaking, in consideration of being allowed to ship its packages of newspapers as freight on this train, to indemnify it against all loss resulting from the operation of the train up to $125 for each round trip thereof; complainant thereby seeking, so far as the railway was concerned, to place itself in the same condition of liability as was the Commercial Publishing Company. This tender was also declined.

Thereupon the complainant offered for transportation, with charges prepaid, its packages of newspapers

to the Southern Express Company, which was shipping express matter on this train; but it also declined to receive or transport these packages, assigning as a reason for the refusal that the railway company had reserved to itself exclusively this right. The record discloses that, in order to avoid complications which possibly might result from this refusal, the express company temporarily withdrew its service from these particular trains.

Thus thwarted in all its efforts to avail itself of the advantage of this daily train, and there being none other by which it could reach its subscribers in the territory tributary to this railway, so as favorably to compete with the Commercial Appeal newspaper, the present bill was filed.

The theory of the bill is found in the ninth clause thereof, which is in these words: "Complainant avers that in receiving and transporting the papers of the aforesaid Commercial Publishing Company on said train, thus enabling it to deliver its papers to its subscribers in that particular territory a short time after the publication thereof, and in refusing to receive and transport on the same terms the papers of complainant, and thus depriving it of an opportunity to deliver its papers to its subscribers with equal promptness, the defendant railway company has been, and still is, granting daily to said Commercial Publishing Company an undue, unreasonable, and unlawful preference or advantage over complainant, and has been, and still is, guilty of an unjust and illegal discrimination against complainant

and in favor of the said Commercial Publishing Company. . . .

Complainant is advised, and so charges, that the said contract so entered into by and between defendant and the said Commercial Publishing Company, in so far as it attèmpts to give to the said Commercial Publishing Company a monopoly of transportation of a certain kind of traffic, to wit, newspapers, causes the defendant Southern Railway Company to violate its duty as a common carrier by refusing to receive and transport on said trains the newspapers or publications published by any other publisher than said Commercial Publishing Company, is absolutely prohibited, and unlawful;" and that the contract was also violative of the seventeenth section of an act of the general assembly of the State of Tennessee, passed March 24, 1897, and approved April 7, 1897, which is in these words: "Be it enacted, that it shall be unlawful for any corporation to make or give any undue or unreasonable preference or advantage to any particular description of traffic, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage." Acts 1897, p. 120, c. 10.

The prayer of the bill was, in effect, that the rights of the complainant in this regard be ascertained and established, that an injunction be awarded restraining the defendant the Southern Railway Company as a common carrier from discriminating in favor of the Commercial

Publishing Company and against the complainant in the transportation of packages of their respective newspapers upon this train, and for a mandatory injunction requiring the railway company to accord to it the same privileges as was granted the Commercial Publishing Company in the matter of transportation, upon the tender of freight charges and guaranties against loss such as had been executed by the Commercial Publishing Company; and upon final hearing it was asked that the injunction be made perpetual and general relief be granted.

To this bill answers were filed by the two defendants, in which it was insisted that under the conditions existing at the time of the making this contract it was legal; that there was at that time no early train service out of Memphis on which newspapers could be carried; that the railway company did not believe this train would be self-supporting, and it was only at the solicitation, and upon the guaranty, of the Commercial Publishing Company, that it should earn at least $125 for each round trip, that the train was put on; that in the early history of its operation it was not self-sustaining, but entailed a loss on the Commercial Publishing Company, under its guaranty, of about $7,000 in money paid by it to the railway company. Under these facts it was insisted that this train was a chartered train, on which alone the Commercial Publishing Company was entitled to carry its newspapers; that the railway company, in complying with this contract here-

inbefore set out, was not a common carrier, and was not guilty of any unjust, unlawful, or discriminating conduct against the complainant.

With its answer the Commercial Publishing Company filed a cross bill, in which, after repeating many of the allegations of its answer, it insists, among other things, that, if the Memphis News Publishing Company should, by decree of the court, be let into an equal enjoyment of this train service, for the carriage of its packages of newspapers, then it should only be on the conditions that it reimburse the cross complainant to the extent of one-half the money paid out by it in the establishment of this service, and, in addition, one-half the value of the advertisements which, under the contract, it had done for the railway company. To this end the chancellor was asked that, if it should be held the News Publishing Company was entitled to an equal advantage in this service, then it should be decreed to pay to cross complainant one half of all such sums. This cross bill was dismissed on demurrer.

Upon the hearing of the issue made by the original bill and answers thereto, a decree was entered adjudicating all the questions involved in favor of the Morning News Publishing Company. From the decree dismissing its cross bill, and from the final decree, the Commercial Publishing Company has appealed, and now makes the following assignment of errors, to wit:

"(1) The court erred in holding that the contract with the Commercial Publishing Company was made by

the Southern Railway Company as a common carrier, and that it was invalid and illegal, in that it undertook to grant exclusive rights and privileges to the Commercial Publishing Company, and in holding that the Memphis News Publishing Company was entitled to the same rights as were conferred upon the Commercial Publishing Company by the said contract in transporting its newspapers and employees on this train.

"(2) The court erred in holding that the contract between the Southern Railway Company and the Commercial Publishing Company was not valid.

"(3) The court erred in holding that the contract between the Southern Railway Company and the Commercial Publishing Company created a monopoly, that it unjustly and illegally discriminated against the Memphis News Publishing Company, and was invalid as against said company.

"(4) The court erred in holding that the Memphis News Publishing Company was entitled to transport its papers and employees on this train, and to enjoy equal privileges and rights with the Commercial Publishing Company thereon, without paying to it anything therefor.

"(5) The court erred in not holding that, before the Memphis News Publishing Company could conduct its business and transport its newspapers and agents on this train, and avail itself of all the rights and privileges accorded to the Commercial Publishing Company on said train under its contract with the Southern Railway

Company, the said Memphis News Publishing Company should be required to pay to the Commercial Publishing Company one half of all the sums of money expended by it in inaugurating and maintaining the operation of the said train, and in advertisements and other expenditures, which amounted to a very large sum of money."

The first three of these assignments may well be treated together, as raising the question whether the Southern Railway Company, in the matter of the transportation of the newspapers of the Commercial Publishing Company, is a common carrier; for, if so, then it cannot, at common law or under the statute, discriminate against any other person who in like condition, with a tender of all reasonable charges, offers its newspapers to be transported as freight over its line of road.

The criterion by which it is ordinarily determined whether one is a common carrier is that "he has held himself out, or has advertised himself in his dealings or course of business with the public, as being ready and willing for hire to carry particular classes of goods for all those who may desire the transportation of such goods between the places between which he professes in this manner his readiness and willingness to carry. If he has done so, he is, of course, to be regarded as a common carrier; but, if not, he will be treated as a private carrier for hire." Hutchinson on Carr., sec. 48. This, however, it has been held is not a universal test. There are cases, exceptional, it is true, where a party has had imposed upon him the character of a common carrier,

though it be he has not given the public to understand that this was his profession, but has carried only in occasional or particular instances, but in this has received hire for his service. In *Gordon* v. *Hutchinson,* 1 Watts & S., 285, 37 Am. Dec., 472, and *Moss* v. *Bettis,* 4 Heisk., 661, 13 Am. Rep., 1, it was ruled that such a party *pro hac vice* assumed the responsibilities of a common carrier.

Whatever doubt may have been thrown by text writers on the wisdom of extending the common-law definition or rule so as to embrace such exceptional cases, there can be none that commercial railroad companies are by their very nature and organic character common carriers. Recognizing them as public utilities, as well as private enterprises, there has been conferred upon them extensive rights and franchises, among these being that of the right to invoke the power of eminent domain; but at the same time, whether by statute or upon the principles of the common law, they have had imposed upon them duties they cannot avoid, one of which is that they shall serve the public without unjust discrimination. Not only have they been fostered by the government, but by reason of aggregation of capital and the great facilities which they possess for the transportation of all the commodities of commerce, they have practically monopolized the land carriage of the country. This being so, it is just and proper that they should be held to the strict dis-

charge of their common law and statutory duties. Hutchinson on Carr., sec. 67.

One of the duties imposed upon a railroad as a common carrier is that it shall deal fairly and impartially with all who seek, as passengers or shippers of freight, to avail themselves of its service. Impressed, as it is, by its grant of franchises, with a trust to the public, this trust can only be discharged by extending equal facilities to each member constituting the public. It fails of its duty, therefore, when discriminating between individuals in like condition, it gives one an advantage in the carriage of his person or property which it refuses to another, and it follows that any contract made by it, by which one or more members of a class are fostered at the expense of or to the detriment of others of the same class, who demand like service, is unenforceable.

Granting that goods not dangerous in their nature and not unfit for shipment are offered at a proper place and time, and that the cost of carriage is tendered, and the railroad has facilities for shipment, then it must accept and transport them. In doing this it "can show no favor, nor make distinctions which will give one employer an advantage over another, either in the time or order of shipment, or in the distance of the carriage, or in the conveniences or accommodations which may be afforded." Hutchinson on Carr., sec. 297; *New Eng. Ex. Co.* v. *Maine Cent. R. R.*, 57 Me., 188, 2 Am. Rep., 31; *Messenger* v. *Penn. R. R.*, 36 N. J. Law, 407, 13 Am.

Rep., 457; *Union Pac. Ry. Co.* v. *Goodridge,* 149 U. S., 680, 13 Sup. Ct., 970, 37 L. Ed., 986.

These general principles are conceded by the defendants to be sound, but it is insisted they do not control the present case. It is admitted—or it is true, whether admitted or not—that the railway company, as to the train in question, was a common carrier of passengers and their baggage, and of mail and express; but it is contended that it was, by reason of its contract with the Commercial Publishing Company, a private carrier of newspapers, and therefore was under no obligations to admit the newspapers of the complainant on its train.

It is true "a common carrier may become a private carrier or bailee for hire, when as a matter of accommodation or special agreement he undertakes to carry something which it is not his business to carry." Hutchinson on Carr., sec. 44. For example, "if a carrier of produce, running a truck boat, should be requested to carry a keg of silver or a load of furniture, . . . he might justly refuse to receive such freight, except by such an agreement as he might choose to make. . . . But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the purpose of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, it is a common carrier, and a special contract about its responsibility does not divest it of the character." *N. Y. C. R. R. Co.* v. *Lockwood,* 17 Wall., 357, 21 L. Ed., 627.

If the contract complained of in this case was one which granted an exclusive right and privilege to the Commercial Publishing Company to sell its newspapers on this train, and the complainant was here seeking to interfere with this contract and to force the railroad to grant it an equal privilege, then there would be presented a special agreement which the courts would not intermeddle with; and this upon the ground that as a common carrier it owed no duty to furnish newspapers to the traveling public, and was not bound to permit another to do so. If it chose, however, to grant this privilege, another to whom it was refused would not be heard to complain.

But this is not the case at bar. Under the contract the railway company is carrying the newspapers of the Commercial Publishing Company as property, and the complainant is insisting that, having the means of doing so, it should equally and impartially carry its packages of papers upon the same terms as merchandise.

It would hardly be contended that a railroad by making a special and exclusive contract to transport shoes manufactured by one party in a community, could strip itself of its common-law character, and decline, without any reason save the existence of said contract, to transport boxes of shoes for another manufacturer in the same community. If this be so, where is the controlling difference between such a case and the one now before us? Packages of newspapers are as much property as shoes, and the principle which controls in the one case, it seems

to us, must equally apply to the other.   If this be not so, by parceling out its means of transportation to the full extent of its carrying capacity, it would be possible for a railroad to build up a few in a community to the destruction of the many who equally seek shipment.

This the law will not tolerate in one who holds himself out as a common carrier.   As has been already said, he must accord equal privileges to all who are in like condition.   He cannot foster monopolies.   He will not, by making special preferential agreements, be permitted to build up one set of shippers at the expense of another. He must carry for all alike.

These general  principles being  established, what is there to prevent their application in this case?   We see nothing.   A railroad by its very nature, as has been seen, is a common carrier.   The train in question is a scheduled one, advertised to the world as such.   An invitation is given to the public to take passage and ship freight upon it.   Its own employees manage, and the railway company appropriate all its revenues.   So far as the record shows, it receives on this train merchandise from every other member of the community, and refuses carriage alone to that of this complainant; and this refusal is based, not upon a lack of carrying capacity, but exclusively upon the ground that it has contracted away its duty, in respect to such property as the complainant has tendered, to another party.

Such an excuse cannot  relieve the railway company

from its obligations to complainant as one of the public, unless it be that the contract in question brings this within the lines of certain exceptional cases on which the defendants rely as authority for their contention.

Some of these cases, which may be taken as representatives of their respective classes, will be now referred to.

It has been held that a common carrier of passengers may establish in his car or vessel an agency for the delivery of passengers' baggage, and may exclude all other persons from entering upon it for the purpose of soliciting or receiving orders therefor. *Barney* v. *Oyster Bay, etc., Steamboat Co.,* 67 N. Y., 301, 23 Am. Rep., 115. It has been also held that a railroad corporation may exclude from its right of way one party who comes to sell lunches to its passengers and admit another to this privilege, if it pleases (*Fluker* v. *Ga. R. R., etc., Co.,* 81 Ga., 461, 8 S. E., 529, 2 L. R. A., 843, 12 Am. St. Rep., 328), and that a steamship corporation and a railroad may equally give preferential privilege to certain hackmen to solicit passengers on their property and exclude others (*Smith* v. *New York R. R. Co.,* 149 N. Y., 249; *Norfolk & W. R. R.* v. *Old Dominion Bag. Co.,* 99 Va., 111, 37 S. E., 784, 50 L. R. A., 722).

These cases and others like them rest, however, on the ground that, save as to duties which he owes to the public, a common carrier has as complete dominion over its property, whatever it may be, as does every other owner, and may therefore exclude from or admit to it, at its will, particular persons. In other words, an inhibition

upon preferential indulgences extends only to those services which inhere in or pertain to the office of a common carrier, and beyond these he is entitled to the absolute control of his own, and that in none of the matters covered by these cases does he owe anything to the public.

In *Audenried* v. *Philadelphia & Read. R. R.,* 68 Pa., 370, 8 Am. Rep., 195, the question was as to the right of the defendant company to so parcel or divide its wharf among other coal dealers as to exclude the complainant therefrom. After expressing great doubt as to whether the defendant, under its charter, was bound to provide wharf accommodations to any of the coal dealers in question, or was a trustee to any extent for them, the court adds: "But, concede both of these points; what then? As trustee there is a discretion reposed in them in the use of the property with which a chancellor cannot interfere. It is agreed that they have not room enough for all. They must select some and reject others. Can a chancellor inquire into their motives and, not approving of them, assume the selection himself?" The court in this opinion by necessary implication declared that its holding could not be authority for such a contention as is now made by these defendants; for it adds: "Transportation by a common carrier is necessarily open to the public upon equal and reasonable terms. An exclusive right granted to one is inconsistent with the rights of all others. This was not transportation, but wharfage, the

nature of which requires exclusive possession temporarily."

In *Hoover* v. *Penn. R. R.*, 156 Pa., 220, 27 Atl., 282, 22 L. R. A., 263, 36 Am. St. Rep., 43, the court held that an agreement made in 1881 to charge a uniform rate on shipment of coal to the Bellefonte Nail Works for consumption in operating its machinery could not be complained of as unjust discrimination against a mere dealer, who received his coal over the same road and was charged a higher rate. This was held not to be unjust discrimination, because the business of the coal dealer paid but one freight to the carrier, while that of the nail company paid two freights, to wit, one for handling the coal to the nail works, and the other for carrying all the products manufactured by the nail company. "This," said the court, "was a most important and vital difference in the conditions and circumstances of the two shipments. The authorities are very clear and strong that, where an additional freight is obtained by means of the lesser charge, the discrimination is justified, both at common law and under the statute."

To save such an arrangement from condemnation, however, it must appear that "the same advantages" were "extended to all persons under the like circumstances. This latter incident," adds the court, "would, of course, be essential where all the favored class were in the same business." The case was distinguished from *Messenger* v. *R. R. Co.*, 37 N. J. Law, 531, 18 Am. Rep., 754, where it was held that there was a clearly un-

News Pub. Co. v. Southern Ry. Co.

lawful preference by the common carrier in favor of one party over all others in the same business in "giving him a specified drawback upon freight on hogs carried from the same points." "This drawback," said the Pennsylvania court, "as of course, was giving one a direct preference over all others, and was in violation of the law."

We think, as the discrimination of the case at bar is one in favor of and against another of the same class, it falls under the condemnation of the Messenger Case, rather than being within the saving authority of that Hoover, supra.

Nor can we see how the fact that the solicitation or the money of the Commercial Publishing Company, however commendable was its exhibition of public or private enterprise, contributed to the institution of this train service and its support in its early days, is to affect this question. From the beginning the railway company has itself recognized that it was operating this train as a part of its common carrier service. It was in no sense a special train, chartered for a special purpose, with the carriage of freight and passengers as simply incidental. The contract itself gives notice that it is a public enterprise, and the contemporaneous conduct of the parties has so construed it. The railway company has controlled it by its own employees, and has advertised its readiness to serve the public with it; and the Commercial Publishing Company, according to this record, has continually pub-

lished it as one of the schedule trains of the railway company.

It is said, however, that the railway company has other trains going out every day, though later in the day, on which the complainant may ship his papers. But it was the duty, upon the record, of the company to receive the packages for shipment. Having done this, it could make no "discrimination, either in the time or order of shipment," between these two publishing companies. Hutchinson on Carr., sec. 297. It was bound to use due diligence in the delivery of the goods. *N. & C. R. R.* v. *Jackson*, 6 Heisk., 271.

It is also said that, if complainant wishes a train to use in carrying its goods, it should make a special contract, as is relied on in this case by the defendant. This would be a good answer for the railway company, if complainant wanted an early service and there was no train on which it could render the service. But it is not for either defendant, with the present train on, amply able to take complainant's goods, to decline only upon the ground of the special agreement.

After a careful consideration of the assignments of error raising the question as to legal effect of this agreement upon the carrier duty of the railway company, we hold that they are not well taken, and they are overruled.

There remains open now only the assignment of error upon the action of the chancellor in sustaining the demurrer to the cross bill. In arguing this assignment,

the cross complainant overlooks the fact that the real controversy in this cause is between the Memphis News Publishing Company and the railway company. It was a proper, but by no means a necessary, party to this suit. No relief was asked against the Commercial Publishing Company. Complainant sought a remedy alone against the railway company, and this remedy would have been applied as effectually without, as with, the former company a party defendant; and the defense of the railway company, if sound in law, was maintainable even if it stood alone. This company has been paid all it is entitled to, and is claiming nothing for past service. This being so, we know of no principle upon which the cross complainant can in this suit work out any equity against complainant, if it has any; for on this cross bill it is in the attitude it would be in if, not a party to this suit, it had filed an independent bill, and asked the court to grant it relief before giving a decree in favor of the Morning News Publishing Company against the railway company. It would hardly be insisted that such a bill could be maintained.

Nor do we think the contention of cross complainant that the original complainant shall be compelled to account to it for one-half of the sums expended in placing this train service on a self-sustaining basis before being let into its enjoyment can be maintained on other grounds.

First. We think it would be impracticable to state an account that would do equal justice to the parties. While

it would be easy to ascertain the amount of money expended and the value of the service rendered in fostering this train by cross complainant, yet it would be impossible to ascertain the kind or the value of the advantages derived by it from this enterprise. Certainly the worth of this advantage should be taken into account.

Second. If bound to contribute at all, we think the Morning News Publishing Company could only be required to do so to the extent of its proportionate part of the same; all other shippers who have availed themselves of this service being equally liable to contribution.

Third. Having held, however, that the duty of a common carrier attached from the establishment of this train service, it follows that every shipper who made a timely and proper tender of freight was entitled to its benefit, as long as there was accommodation for his freight, without regard to the connection between the railway company and other shippers. All other things being equal, the company was bound to accept and make prompt delivery of the goods so tendered. Neither the company nor a third party could impose as a condition for acceptance and delivery that complainant should agree to share a burden voluntarily assumed by this third party. No more can either demand at this day that this burden shall now be divided as a condition precedent to the railway company's discharging its duty.

However meritorious this claim of cross complainant, we can see no legal or equitable ground on which it can be vested. The assignment is therefore overruled.

The decree of the chancellor is in all things affirmed.