* ALADDIN INDUSTRIES, Inc. v. ASSOCIATED TRANSPORT, Inc., et al.—298 S. W. (2d) 770.*

Middle Section. July 27, 1956.

Petition for Certiorari denied by Supreme Court, February 8, 1957.

*See same case,—Tenn. App.—, 323 S. W. (2d) 222, certiorari denied by United States Supreme Court, *sub nom.* McCrary v. Aladdin Radio Industries, Inc. 80 S. Ct. 117, 4 L Ed, (2d) 104.

54

Waller, Davis & Lansden, Nashville, for Aladdin Industries, Inc.

Cooper, Mitch & Black, Birmingham, Ala., and Williams, Harwell, Howser & Thomas, Nashville, for appellant Truck Drivers.

Moore, Crownover, Branstetter, Folk & Fisher, Nashville, for appellants Local 327 and Don Vestal.

FELTS, J. The principal case is an injunction suit by a shipper against 14 common carriers to compel them to continue rendering complainant their customary service, which they had stopped because their truck drivers refused to cross another union's picket line at complainant's plant. After a hearing, the Chancellor granted a preliminary injunction, as prayed, which, following the practice in equity, ran against defendants ''and their

officers, agents, and employees''. That case is still pending below.

The phase of it now before us is an ancillary proceeding against some of these employees, their union, and its officers, for contempt for violating the injunction. After a trial, the Chancellor sustained charges of contempt against 13 of these truck drivers and their union, Local Union No. 327 of Teamsters, Chauffeurs, Helpers, and Taxicab Drivers (hereinafter called Local 327) and its president, Don Vestal; and entered a decree adjudging them guilty of contempt, sentencing each of the men to three days in jail, and taxing Local 327 with all the costs.

They appealed and contend that the Chancery Court had no jurisdiction of the case, and no power to grant the injunction or to punish them for disobeying it; that the injunction was void, they had a right so to treat it, and could not be held in contempt for doing so. Churchwell v. Callens, 36 Tenn. App. 119, 252 S. W. (2d) 131; United States v. United Mine Workers of America, 330 U. S. 258-385, 67 S. Ct. 677, 91 L. Ed. 884-961.

They urge that the court had no jurisdiction of the subject matter, because it involved a ''labor dispute'' within the exclusive jurisdiction of the National Labor Relations Board, or a transportation matter within the exclusive jurisdiction of the Interstate Commerce Commission or the Tennessee Public Service Commission. They further contend that the Chancellor's decree deprived them of their right to freedom of speech under the Constitutions of the United States and of Tennessee, and that the evidence does not support the decree.

Complainant, Aladdin Industries, Inc., has a plant just outside the city limits of Nashville where it manufactures

goods. It ships large amounts of materials to the plant and large quantities of manufactured products from the plant. Such shipments are both intra- and interstate, and have been customarily carried by defendant carriers, which maintain pickup and delivery service at the plant. Complainant is largely dependent on such service for continuance of its business.

Defendants are corporations and common carriers of freight by motor truck, operating under certificates of convenience and necessity from the Interstate Commerce Commission and from the Tennessee Public Service Commission. Their truck drivers and helpers are all members of Local 327, with which defendants have a collective bargaining contract which covers these employees and which contains the following provision:

"It shall not be in violation of this contract if any employee or employees refuse to go through the picket line of a Union or refuse to handle 'unfair goods.' Nor shall the exercise of any rights permitted by law be violation of this contract. The Union agrees that in the event the Employer becomes involved in a controversy with any other Union, the Union will do all in its power to help effect a fair settlement" (Art. XI, p. 10, Ex. 1, Gilliam, tr. end Vol. 1).

Aladdin Radio Industries, Inc., is another and different corporation from complainant, engaged in a different business, but is an affiliate of complainant and leases and occupies space in complainant's plant, both of them using the same entrances to the plant. Each of them, however, has its own separate employees, represented by different unions. The representative and collective bargaining agent of employees of the affiliate is Local Union

No. 5003 of the United Steelworkers of America, while such agent for complainant's employees is Local Union No. 4802 of the United Steelworkers.

The collective bargaining contract between Local 5003 and Aladdin Radio Industries, Inc., covering its employees expired January 24, 1955, the employees went on strike next day, and Local 5003 placed pickets at the entrances to complainant's plant and has maintained them ever since. Complainant's employees, however, did not strike but continued to pass back and forth across the other union's picket lines.

Likewise, defendant carriers continued their customary pickup and delivery service at the plant, and their truck drivers and freight-handling employees, members of Local 327, continued to cross the other union's picket lines at complainant's plant without objection. But early in February 1955, a number of defendant carriers ceased to render service at complainant's plant, and refused to permit complainant to come to their freight yards and pick up freight consigned to it, because their employees had become unwilling to cross Local 5003's picket line at its plant or to handle freight for it.

On February 8, 1955, complainant filed its bill against seven of the carriers which were refusing to handle freight for it. On February 11, 1955, as before stated, the Chancellor granted a temporary injunction, as prayed, enjoining defendants "and their officers, agents, employees", and "confederates from failing and refusing to provide customary service to complainant, under the legally established rates and rules applicable to such service, as the same had been rendered before February 3, 1955".

When this injunction was served on defendants and their employees were notified of it, they began complying with it, the carriers resumed their customary service to complainant, carrying shipments to and from its plant, their employees crossing 5003's picket lines without trouble. They continued to furnish the service from February 11, when the injunction was served, until May 17, 1955, when the carriers again quit rendering the service, because their employees now refused to cross the picket lines.

Complainant then began filing petitions against the carriers, their employees, Local 327, its officers, and Local 5003 and its officers, for contempt for disobeying the injunction, alleging specific instances of such disobedience and of refusals to make requested shipments or deliveries of freight for complainant. These refusals persisted, and there were six successive contempt petitions filed. We need not detail the contents of each of them.

The main charge in them was that Local 327, its officers, Local 5003, and its officers, entered into a conspiracy to violate the injunction and to induce the truck drivers to violate it by refusing to cross the picket line to render the service at the plant; that on June 1, 1955, Local 327 placed persons at the plant with a large sign: "Teamsters Local Union 327", with a statement beneath in small type: "We invite the office employees of this plant to join the Teamsters Union"; that local 327 had no authority to organize complainant's office workers; and that this was not a bona fide picket sign but a subterfuge to induce drivers, to continue disobeying the injunction.

It was further charged that Local 327 continued to keep

these persons with this sign at the plant, continued to maintain this subterfuge; that these persons were stopping the truck drivers and threatening them with harm or disciplinary action if they drove defendant carrier's trucks across the picket line into the plant to deliver or pick up freight for complainant; and that they were persisting in willfully disobeying the court's injunction.

These two unions, their officers, and many of the truck drivers filed pleas denying that the court had jurisdiction of the subject matter of the suit and averring that exclusive jurisdiction of it was in the National Labor Relations Board. A number of these truck drivers brought this question to this Court by petition for certiorari and supersedeas, which was denied in an opinion filed July 22, 1955, unreported.

These pleas were overruled by the Chancellor and answers were filed denying the charges. Local 327 admitted that it had placed the persons with the sign at the plant, but averred that this was a picket line set up in good faith to organize complainant's office workers. Appellant truck drivers admitted that they had refused to cross the picket line or render the service, but averred that the reason for their refusals was their fear of violence to themselves or their families if they crossed the picket line. '

Meanwhile, there were a number of hearings before the Chancellor upon the question of his jurisdiction and upon some of the contempt petitions. He concluded he had jurisdiction and on June 13, 1955, entered an order dismissing the first three contempt petitions and stating that the injunction theretofore issued would be strictly enforced even though it required employees of the car-

riers to cross a picket line at complainant's plant, but that no bona fide member of Local 5003 would be required to cross its own picket line at the plant.

Thereafter, there were further hearings before the Chancellor upon the other contempt petitions. He found that the carriers had in each instance dispatched their truck drivers to render the service, and had done their best to comply with the injunction; and he dismissed the petitions as to them. He also dismissed the petitions for want of proof as to all the other respondents except appellants. He found appellants guilty and decreed that they be punished as above stated.

The defense urged for them is twofold: (1) that the court had no jurisdiction of the case, the injunction was void, and they were not bound to obey it; but (2) that there is no sufficient proof that they did disobey it or were guilty of the contempt charged. They contend that the court had no jurisdiction of the subject matter of this suit, because it involved a "labor dispute" within the exclusive jurisdiction of the National Labor Relations Board, or an administrative matter within the exclusive jurisdiction of the Interstate Commerce Commission or of the Tennessee Public Service Commission.

The subject matter of a suit is, of course, the matter presented by the pleadings—the bill and the pleas and answers thereto. The matter thus presented in this case is a controversy between a shipper and defaulting carriers. It does not involve any employer-employee relation or any labor dispute between the parties to the suit.

There was no labor dispute between complainant and its employees. While there was a labor dispute between

complainant's affiliate and the latter's employees, and while they were on strike and were picketing the plant, this suit did not involve that dispute or seek to interfere with the strike or to stop the picketing. The only conduct complained of by the suit is the conduct of the carriers in not rendering their service, and the conduct of appellants in interfering to prevent such service.

■ That this conduct is unlawful cannot be denied. It violates both the common law and the statutes of Tennessee. At common law the calling of a common carrier is a public trust. The carrier and its employees owe a duty to serve all shippers alike and to receive, carry, and deliver whatever kind of goods it holds itself out to carry, at the applicable rates; and our statutes declare this duty and make a violation of it a misdemeanor. T. C. A. secs. 65-422, 65-512, 65-514, 65-1523, 65-1524.

■ Under the general rule of equity, and also under our statute T. C. A. secs. 65-1523, 65-1524, a shipper is entitled to an injunction to compel a common carrier to render service, and to restrain other persons from interfering with the rendering of such service. Gibson's Suits in Chancery (4th ed.) sec. 804; Hogan v. Nashville Interurban Railway Co., 131 Tenn. 244, 174 S. W. 1118, L. R. A. 1915E, 788, Ann. Cas. 1916C, 1162; Memphis News Publishing Co. v. Southern Ry. Co., 110 Tenn. 684, 75 S. W. 941, 63 L. R. A. 150.

■ This is also the general rule of equity in state and federal courts. A shipper is entitled to an injunction to require the carrier to perform its duty of carriage, and the injunction against the carrier also runs against his agents and employees, as a matter of course and without their being made parties to the suit. Toledo, A. A. &

N. M. Ry. Co. v. Pennsylvania Co., C. C., 54 F. 730, 742, 19 L. R. A. 387, 393; Montgomery Ward & Co. v. Northern Pacific Terminal Co., D. C. 1953, 128 F. Supp. 475-519; Id., D. C., 128 F. Supp. 520-527; Burlington Transportation Co. v. Hathaway, 234 Iowa 135, 12 N. W. (2d) 167, 149 A. L. R. 1238.

"An injunction not only binds parties defendant but also those identified with them in interest or subject to their control, and may issue against and be binding on the agents and employees of a party without the agents and representatives being made parties to the suit. In re Lennon, 166 U. S. 548, 17 S. Ct. 658, 41 L. Ed. 1110; Chase National Bank [of City of New York] v. [City of] Norwalk, 291 U. S. 431, 54 S. Ct. 475, 78 L. Ed. 894; and Rule 65 (d), Federal Rules of Civil Procedure, 28 U. S. C. A." Baltimore &O. R. Co. v. Chicago River & Indiana R. Co., 7 Cir., 170 F. 2d 654, 659, certiorari denied Brotherhood of Railroad Trainmen v. Baltimore & O. R. Co., 336 U. S. 944, 69 S. Ct. 811, 93 L. Ed. 1101.

At this point, we refer to appellants' claim that the subject matter of this suit is within the exclusive jurisdiction of the Interstate Commerce Commission or the the Tennessee Public Service Commission. We find no merit in it. The subject matter of this suit does not involve the reasonableness of any rate, rule, regulation, or any of the other administrative matters exclusive jurisdiction of which is in the Interstate Commerce Commission in transportation involving interstate commerce, or in the Tennessee Public Service Commission in local transportation.

So far as local transportation is concerned, our statute

expressly provides that "any interested party in his or its own name, is given the power and right by bill of complaint in any chancery court having jurisdiction of the parties, to seek injunctive relief, prohibitory or mandatory, or both, to compel" a carrier to comply with its duty of carriage. T. C. A. sec. 65-1523.

■ In cases of transportation in or affecting interstate commerce, state courts have concurrent jurisdiction with federal courts to grant shippers injunctive relief against defaulting carriers; and such jurisdiction was not superseded by the Interstate Commerce Act and its amendments. 49 U. S. C. A. sec. 22; Pennsylvania Railroad Co. v. Sonman Shaft Coal Co., 242 U. S. 120, 124, 37 S. Ct. 46, 61 L. Ed. 188; Montgomery Ward & Co. v. Northern Pacific Terminal Co., D. C., 128 F. Supp. 475, 494-495; Peoria & P. U. R. Co. v. United States, 263 U. S. 528, 535, 44 S. Ct. 194, 68 L. Ed. 427, 431, and cases there cited in footnote 8; Central New England R. Co. v. Boston & A. R. Co., 279 U. S. 415, 416, 420, 49 S. Ct. 358, 73 L. Ed. 770, 771, 775.

■ As an additional ground for their claim that the court had no jurisdiction to grant the injunction, appellants seek to invoke a provision of the tariff filed by defendant carriers with the Interstate Commerce Commission and the Tennessee Public Service Commission, which was as follows:

"Where strikes, picketing, riots or other labor disturbances, or where conditions of streets, roadways, alleys, yards or the exterior or interior of premises make it impracticable, unsafe, or impossible to render pick-up and/or delivery service, such service will

not be given" (Ex. 1, Worley, tr. Vol. II, pp. 401, 435).

The effect of this is that the carriers may be excused from rendering such service when the conditions mentioned make it "impracticable, unsafe, or impossible" for them to render such service. But the proof shows that no such condition existed here. In each instance the carriers dispatched their trucks and drivers to render the service, and such service was regularly rendered from February 11, when the injunction issued, to May 17, when the drivers quit rendering the service because it involved crossing the other union's picket line, which they now refused to do.

The only excuse for not continuing the service was the driver's refusal to cross the other union's picket line. This tariff provision was for the benefit of the carriers. They did not invoke it, because there was no condition making it applicable. Nor do we think appellants can invoke it. To allow them to do so would be to permit them to set up their own wrong as a ground to defeat the court's jurisdiction.

Appellants' main contention is that the court had no jurisdiction of the subject matter of this suit and no power to issue the injunction, because it involved a labor dispute within the exclusive jurisdiction of the National Labor Relations Board. This question must be determined upon the state of the case at the time the court assumed jurisdiction and issued the injunction. If the court then had jurisdiction, such jurisdiction was not defeated by the subsequent conduct of Local 327 and its officers, in placing their picket sign at the plant, during the contempt proceedings. So we here consider the case

apart from that subsequent circumstance, which we hereinafter consider in another connection.

The argument for appellants is that the conduct here enjoined was either a "concerted activity" protected by section 7 [1] and section 13 [2] of the federal Acts, 29 U. S. C. A. secs. 157, 163, or an "unfair labor practice" prohibited by section 8 [3] (b) (4) (A, D); and that in either event the exclusive jurisdiction was in the National Labor Relations Board, and the state court had no power to enjoin such conduct.

---

[1] Section 7 is as follows: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities * * *."

[2] Section 13 is as follows: "Nothing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

[3] This part of section 8 is as follows: "(b) It shall be an unfair labor practice for a labor organization or its agents— * * *

"(4) to engage in, or induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * * (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification or the Board determining the bargaining representative for employees performing such work: *Provided,* That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter". 29 U. S. C. A. sec. 158(b) (4) (A, D).

Thus by section 7 employees have a right to join or assist labor organizations, to bargain collectively through their own chosen representatives, to engage in other "concerted activities" for collective bargaining or other mutual aid or protection, or to refrain from any or all of such activities; while section 13 provides that nothing in the Act, except as therein provided, shall be construed to interfere with "the right to strike"; and section 8 (b) outlaws certain kinds of union conduct as "unfair labor practice[s]".

These provisions are cast in terms that are not "self-determining or even easy". The Supreme Court has said: "Congress has not seen fit in either of these Acts [Wagner and Taft-Hartley [29 U. S. C. A. sec. 141 et seq.]] to declare either a general policy or to state specific rules as to their effects on state regulation of various phases of labor relations over which the several states traditionally have exercised control". International Union, U. A. W. A. F. of L., Local 232 (Briggs-Stratton case) v. Wisconsin Employment Relations Board, 336 U. S. 245, 252, 69 S. Ct. 516, 521, 93 L. Ed. 651, 662.

The Court has also said that this law "leaves much to the states, though Congress has refrained from telling us how much", Garner v. Teamsters, C. & H. Local Union, 346 U. S. 485, 488, 74 S. Ct. 161, 164, 98 L. Ed. 228, 238; and that "the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds.' * * * What is within exclusive federal authority may first have to be determined by this Court to be so". Amalgamated Clothing Workers of America v. Richman Bros., 348 U. S. 511, 516, 75 S. Ct. 452, 455, 99 L. Ed. 600, 608.

That Court, in numerous cases during the last decade, has been called on to interpret these Acts and to determine their effect in many particular types of conduct, and in so doing has declared certain rules and principles which we think point the way to a proper decision in this case.

■ *First.* When such a suit as this is brought in a state court and the court's jurisdiction is denied upon a claim of exclusive federal jurisdiction, the court must determine the question for itself. It is true it is sometimes said that a state court has no authority to determine such a question but the matter must be determined by the National Labor Relations Board. But it is of the essence of judicial duty that the court must decide the case, including the question of its own jurisdiction. It cannot stop or send the case to the Board; nor will a federal court interfere to forestall the state court's determination. Amalgamated Clothing Workers of America v. Richman Bros., supra.

■ *Second.* Matters of important local concern, such as "labor relations over which the several states traditionally have exercised control", remain within state power unless and until they are pre-empted by Congress, under the Commerce and Supremacy clauses of the federal Constitution; and in such a case the intent of Congress to exclude state power *must be clearly and unmistakably manifested.* Kelly v. State of Washington, 302 U. S. 1, 9, 58 S. Ct. 87, 82 L. Ed. 3-10; International Union, U. A. W., A. F. of L., Local 232 v. Wisconsin Employment Relations Board, supra; Allen-Bradley Local No. 1111, etc. v. Wisconsin Employment Relations Board, 315 U. S. 740, 749, 750, 62 S. Ct. 820, 86 L. Ed. 1154, 1164.

"Under our constitutional system, there necessarily remains to the states, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. * * * States are thus enabled to deal with local exigencies and to exert in the absence of conflict with federal legislation an essential protective power. * * * The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.' " (Citing numerous cases. ) Chief Justice Hughes, Kelly v. State of Washington, supra [301 U. S. 1, 58 S. Ct. 92] ; quoted approvingly, United Const. Workers, etc., v. Laburnum Const. Corp., 347 U. S. 656, 664, 74 S. Ct. 833, 98 L. Ed. 1025, 1031, footnote 5.

 *Third.* No inference of an intent of Congress to exclude state power over a given type of conduct arises from the mere fact that Congress has brought such conduct within federal control. To warrant an inference of an intent to exclude state power, Congress must not only have taken over such conduct but must also have provided a remedy for it. In the absence of a federal remedy, the state remains free to apply its own remedy. Allen-Bradley Local No. 1111, etc., v. Wisconsin Employment Relations Board, supra; International Union, U. A. W., A. F. of L., Local 232 (Briggs-Stratton case) v. Wisconsin Employment Relations Board, supra; United Const. Workers, etc., v. Laburnum Const. Corp., supra; United Auto., Aircraft & Agr. Implement Work-

ers of America v. Wisconsin Employment Relations Board, 351 U. S. 266, 76 S. Ct. 794, 100 L. Ed. 1162.

We come, then, to the question whether the conduct here enjoined is a "concerted activity" under sections 7 and 13 so as to be protected from state power. As before stated, this case does not involve any employer-employee relation or any labor dispute between the parties to the suit. It is a controversy between complainant and the defaulting carriers. The only conduct involved is the refusal of the carriers' truck drivers, members of Local 327, to cross the other union's picket line and render the service.

The right of members of a union to refuse to cross another union's picket line is, of course, not as important as their right to refuse to cross their own picket line. This latter right is no less than part and parcel of the right to strike for a lawful purpose or the right to support a lawful strike. They may exercise this right even though they thereby inflict injury on the other party to the dispute. Their self-interest justifies "concerned activity" which would be unlawful if done by persons without any unity of interest. Montgomery Ward & Co. v. Northern Pacific Term. Co., supra, 128 F. Supp. 504.

The right to refuse to cross another union's picket line is an important right to labor, but it is not one of the basic, vital interests of Labor, such as the right of workers to self-organization; their right to collective bargaining by representatives of their own choosing; their right to strike in support of their union demand for higher wages and better hours and working conditions; their

right to engage in peaceful picketing to support a lawful strike, all of which rights are protected by section 7.

Since the union conduct here does not involve their right to strike, it would seem not to be within the protection of section 13, and since it does not involve the right to engage in peaceful picketing, or any of the other vital rights of workers, it would seem not to be a ''concerted activity'' within section 7 so as to be protected from state power. At least we have been able to find no Supreme Court decision holding that the right to refuse to cross another union's picket line is a ''concerted activity'' protected by section 7.

It appears that the right of union employees to refuse to cross another union's picket line is not a federally protected right but only a matter of contract and the employer and employee are free to contract as they wish about the matter. As we understand, it was so held in National Labor Relations Board v. Rockaway News Supply Co., 345 U. S. 71, 73 S. Ct. 519, 524, 97 L. Ed. 832, 31, A. L. R. (2d) 511. It was said:

"In the section by which the Labor Management Relations Act prescribes certain practices of labor organizations which shall be deemed unfair, there is a proviso that nothing therein 'shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act * * *.' This clearly enables contracting parties to embody in their contract a provision against requiring an employee

to cross a picket line if they so agree. And nothing in the Act prevents their agreeing upon contrary provisions if they consider them appropriate to the particular kind of business involved.''

But whatever may be the nature of this right of union men to refuse to cross another union's picket line in general, it is not protected by section 7 when it is used to accomplish an object forbidden by state law. The ''concerted activity'' protected by section 7 is lawful activity, not activity which violates the state law. Indeed, the more important right to picket or to strike is not beyond state power when exercised in a manner contrary to state law. International Union, U. A. W., A. F. of L., Local 232 (Briggs-Stratton case) v. Wisconsin Employment Relations Board, supra; Allen Bradley Local No. 1111, etc. v. Wisconsin Employment Relations Board, supra; Giboney v. Empire Storage and Ice Co., 336 U. S. 490, 69 S. Ct. 684, 93 L. Ed. 834; Local Union No. 10, etc. v. Graham, 345 U. S. 192, 73 S. Ct. 585, 97 L. Ed. 946; United Const. Workers, etc. v. Laburnum Const. Corp., supra; United Auto., Aircraft & Agr. Implement Workers of America v. Wisconsin Employment Relations Board, 351 U. S. 266, 76 S. Ct. 794, 100 L. Ed. 1162, supra.

In the case before us the conduct of the truck drivers, in refusing to cross the other union's picket line, prevented the rendering of the carrier service and was a violation of the law of this state; and under the above authorities, we think such conduct was not a ''concerted activity'' protected by section 7, but was unlawful conduct within the power of the state to enjoin.

Appellants rely on the provisions of the collective bargaining contract above quoted. That merely said it would

not be a breach of the contract if an employee refused to go through the picket line of a union or to handle "unfair goods". That contract could not bind third persons or affect the rights of the public. Moreover, insofar as it attempted to relieve the carriers and their employees of their duty to the public, the contract would be illegal and void. Memphis News Publishing Co. v. Southern Ry. Co., supra, 110 Tenn. 703-705, 75 S. W. 945-946.

The conduct here enjoined was not, in our opinion, an "unfair labor practice" under sec. 8(b) of the federal Act so as to be beyond state power. When this suit was brought and the injunction issued, Local Union No. 327 was not on a strike, not engaged in picketing complainant's plant, and not asserting any of the other basic rights of Labor. The only conduct enjoined was the conduct of the carriers and their truck drivers, members of Local 327, in refusing to render the service, which involved crossing another union's (Local 5003's) picket line which was being maintained to support a lawful strike by Local 5003.

As we have seen, sec. 8(b), making certain union conduct unlawful as "unfair labor practices", contains the proviso: "That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter"; that is, a lawful strike.

Thus it seems clear that this subsection 8(b), which defines union "unfair labor practices", excepts from such

practices the kind of conduct here involved. That is, this proviso expressly declares that the refusal of any person to cross another union's picket line (maintained to support a lawful strike) shall not be unlawful or an unfair labor practice under sec. 8(b). Minneapolis & St. L. Ry. Co. v. Pacific Gamble Robinson Co., 8 Cir. 1954, 215 F. (2d) 126, 137.

To support appellants' claim that their conduct here enjoined was unlawful and un "unfair labor practice" under sec. 8(b), they rely on these cases: Amalgamated Ass'n. etc. (Bus Employees) v. Wisconsin Employment Relations Board, 1951, 340 U. S. 383, 71 S. Ct. 359, 95 L. Ed. 364, 22 A. L. R. (2d) 874; Garner v. Teamsters C. & H. Union, 1953, supra; Weber v. Anheuser-Busch, Inc., 1955, 348 U. S. 468, 75 S. Ct. 480, 99 L. Ed. 546; General Drivers, Warehousemen and Helpers, Local Union No. 89 v. American Tobacco Co., Inc., Ky., 1954, 264 S. W. (2d) 250, reversed 1955, 348 U. S. 978, 75 S. Ct. 569, 99 L. Ed. 762; Local Union No. 25 of Intern. Broth. of Teamsters, etc. v. New York, N. H. & H. R. Co., 1956, 350 U. S. 155, 76 S. Ct. 227, 100 L. Ed. 166.

The first of these cases involved the right to strike under sec. 7. Employees of two local public utilities (a transit company and a gas company) called strikes to support union demands. Wisconsin had a statute forbidding strikes in public utilities and providing for compulsory arbitration instead. Under this statute the State enjoined these strikes. It was held that the statute was invalid as in conflict with the federal Act, sec. 7, 29 U. S. C. A. sec. 157, which guarantees public utility employees the right to strike the same as other employees.

In the Garner case the conduct consisted of picketing

which constituted an unfair labor practice under the state law and also an "unfair labor practice" under sec. 8 (b) of the federal Act, which the National Labor Relations Board was empowered to prevent. Since there was a federal remedy for the conduct complained of, it was held that the state could not enjoin such conduct. The principle of that decision was that there could not be two parallel or similar remedies, one federal and the other state, for the same conduct.

In the Weber case there was a strike and picketing by a union, the collective bargaining agent of complainant's employees. Complainant charged the union with an "unfair labor practice" before the Board, which charge was dismissed. In the meantime, complainant sued the union in the state court to enjoin the conduct, alleging it was a secondary boycott in violation of state law and also an "unfair labor practice" under sec. 8(b) (4) of the federal Act. It was held that this averment made a case within the exclusive jurisdiction of the Board. The Court said:

"But where the moving party itself alleges unfair labor practices, where the facts reasonably bring the controversy within the sections prohibiting these practices, and where the conduct, if not prohibited by the federal Act, may be reasonably deemed to come within the protection afforded by that Act, the state court must decline jurisdiction in deference to the tribunal which Congress has selected for determining such issues in the first instance." 348 U. S. 481, 71 S. Ct. 488, 99 L. Ed. 558.

In the General Drivers case, supra, the American Tobacco Company (American) and its subsidiary occupied a plant, both using common entrances. The union, rep-

resenting the subsidiary's employees, called a strike and began picketing the plant. The American brought suit in the state court, alleging the picketing was a "secondary boycott", and seeking an injunction to stop the picketing and to compel common carrier employees, also members of the union, to cross their own picket line and handle freight for complainant.

The state court found that the American and its subsidiary were one entity, and held that the picketing was "legal" and could not be enjoined, because it was primary and not secondary, as alleged; but that American was entitled to an injunction requiring the common carriers' employees to cross their own picket line placed there by their union to support the legal strike, 264 S. W. (2d) 250. The Supreme Court reversed in these words:

"Per Curiam. The judgment is reversed. Weber v. Anheuser-Busch, Inc., 348 U. S. 468, 75 S. Ct. 480 [99 L. Ed. 546]. Amalgamated Ass'n, of Street Electric Railway & Motor Coach Employees v. Wisconsin Employment Relations Board, 340 U. S. 383, 71 S. Ct. 359, 95 L. Ed. 364 [22 A. L. R. (2d) 874]". 348 U. S. 978, 75 S. Ct. 569, 99 L. Ed. 762.

As stated, the American charged the picketing was a secondary boycott, and thus alleged facts constituting a union "unfair labor practice" under sec. 8(b) (4); and insofar as it was sought to enjoin the picketing, it made a case of "unfair labor practice", under the Weber case; and insofar as it was sought to compel the public utility employees to cross their own picket line, it violated their federal right to strike, under the Amalgamated Ass'n (Bus Employees) case, supra.

In the Teamsters case, supra, the railroad sued in the

state court to enjoin the union from picketing its premises, alleging the union conduct was a "secondary boycott" in violation of state law and of sec. 8(b) (4) (A) of the federal Acts. The state court enjoined the picketing. The Supreme Court reversed, holding that the railroad itself had alleged a case of "unfair labor practices" under sec. 8(b) (4) (A), or if the union conduct was not prohibited by sec. 8(b), it might be protected by sec. 7; and the Court quoted the excerpt above quoted from the Weber case.

The principle of the Garner case, that there could not be parallel state and federal remedies for the same conduct, was materially modified in United Auto., Aircraft & Agr. Implement Workers of America v. Wisconsin Employment Relations Board, supra, 351 U. S. 266, 76 S. Ct. 794, 100 L. Ed. 1162, which held that a state court could, under its own labor legislation, enjoin picketing in violation of state law even though it was also an "unfair labor practice" under sec. 8(b) (1) of the federal Acts. That is, there may be two similar remedies, one federal and the other state, for the same conduct in the circumstances.

So we think all of the above cases relied on by appellants differ decisively from this case. In each of those cases the conduct was picketing which was either an "unfair labor practice" prohibited by sec. 8(b) or a "concerted activity" protected by sec. 7 and sec. 13. But in this case there was no picketing by appellants or their union, no "concerted activity" protected by secs 7 and 13, but a mere refusal by them to cross, not their own, but another union's picket line (maintained to support a lawful strike), which refusal, by the proviso of sec. 8(b),

is declared not to be unlawful or an "unfair labor practice" under sec. 8(b).

It seems clear that the conduct here enjoined was neither protected as a "concerted activity" under secs. 7 and 13 nor prohibited as an "unfair labor practice" under sec. 8(b). Moreover, it does not appear that the federal Acts afford any remedy for this conduct, or that the National Labor Relations Board has any power to grant any relief to this shipper against these defaulting carriers and the unlawful conduct of appellants.

The decisions of the Supreme Court support the proposition that, in order to exclude state power over a given type of conduct, it must appear not only that Congress intended to bring such conduct within federal control, but also that the federal Acts afford a remedy for harm caused by such conduct. The lack of the federal remedy has been emphasized as a reason for holding that the conduct has not not been withdrawn from state power but that the state is still free to apply its own remedy.

In International Union, U. A. W., A. F. of L., Local 232 v. Wisconsin Employment Relations Board, supra, 336 U. S. 254, 69 S. Ct. 521, 93 L. Ed. 653, it was said:

"There is no existing or possible conflict or overlapping between the authority of the federal and state Boards, because the federal Board has no authority either to investigate, approve or forbid the union conduct in question. This conduct is governable by the state or it is entirely ungoverned."

In the Garner case, supra, 346 U. S. 488, 74 S. Ct. 164, 98 L. Ed. 238, the Court said:

"This is not an instance of injurious conduct which

the National Labor Relations Board is without express power to prevent and which therefore either is 'governable by the state or it is entirely ungoverned.' In such cases we have declined to find an implied exclusion of state powers. International Union, U. A. W., A. F. of L., Local 232 v. Wisconsin Employment Relations Board, 336 U. S. 245, 254, 69 S. Ct. 516, 521, 93 L. Ed. 651 [663]."

In United Const. Workers, etc. v. Laburnum Const. Corp., supra, a state court was allowed to furnish its remedy by way of damages for tortious conduct which was a union "unfair labor practice" under sec. 8(b). That is, the fact that there was a federal remedy by which the federal Board could have stopped the conduct, did not prevent the state from affording its remedy by way of damages. In that case the Court said:

"In the Garner case, Congress had provided a federal administrative remedy, supplemented by judicial procedure for its enforcement, with which the state injunctive procedure conflicted. Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right to recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct.

\* \* \* \* \* \* \*

"To the extent that Congress prescribed preventive procedure against unfair labor practices, that case [Garner case] recognized that the Act excluded

conflicting state procedure to the same end. To the extent, however, that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated. The care we took in the Garner case to demonstrate the existing conflict between state and federal administrative remedies in that case was, itself, a recognition that if no conflict had existed, the state procedure would have survived." 347 U. S. 665, 74, S. Ct. 837, 98 L. Ed. 1031, 1032.

So we conclude that the conduct here enjoined was not pre-empted by Congress and withdrawn from state power but that, since there appears to be no federal remedy and the Chancery Court had jurisdiction of the subject matter of this suit.

 But regardless of whether the injunction was irregular or erroneous, while it remained in 'force appellants were bound to obey it. In Nashville Corp. v. United Steelworkers, etc., 187 Tenn. 444, 450, 215 S. W. (2d) 818, 821, the Court said:

" 'The mandates of a Court of Chancery must in all cases be obeyed, according to the spirit of the decree, promptly, faithfully and without question, or evasion. The party, upon whom the order or command of the court operates, is not allowed to speculate upon the equity of the bill, or the legality or regularity of the order or decree, or of the writ issued thereon; but his simple duty is to obey; and when he disobeys it is a duty the court owes to itself and to the public to punish him at once' ".

As to appellant truck drivers, the answer of each was in the nature of a plea of confession and avoidance. Each confessed he had refused to obey the injunction but averred in avoidance that the reason for his refusal was that he feared violence or physical harm to himself or his family if he crossed the picket line to render the service, as required by the injunction.

The Chancellor rejected this defense and found that they deliberately disobeyed the injunction. We think the evidence abundantly sustains this finding. There was no showing of any danger of violence to them or their families if they crossed the picket line. They had been crossing it from February 11 till May 17, without violence; and there was no proof that any violence would have likely resulted to them or their families if they had continued to cross it after May 17.

Likewise, the answers of Local 327 and of its president, Don Vestal, were in the nature of pleas of confession and avoidance, confessing that each knew the terms of the injunction, having received a copy of it by registered mail May 18, and that on June 1, Local 327 placed at the plant a picket with its sign, but averring in avoidance that the picket was put there in good faith for the purpose of organizing complainant's office workers.

The proof showed without dispute that on June 1, Local 327 placed at the plant its picket with a placard with its name painted thereon in large letters visible for 500 feet or more, followed by the statement, above quoted, in type so small that it could not be seen or read while the placard was being carried by the picket. This picket was kept there at the entrance of the plant from June 1 to June 17,

and the man doing the picketing was paid for it by Don Vestal out of Local 327's petty cash fund.

The Chancellor found that "said picketing was neither *bona fide* nor for a lawful purpose but was done solely for the purpose of attempting to prevent the complainant from receiving common carrier service which the Court had decreed it was entitled to receive"; that defendant Vestal was in charge of defendant Local 327 and paid for the picketing out of its petty cash fund; and that "such conduct on the part of said defendants was a willful interference with the lawful processes of the court and contemptuous of it".

There were a number of circumstances against the *bona fides* of the picketing. The injunction had been issued requiring the truck drivers to continue rendering the service, which involved their crossing the other union's (Local 5003's) picket line, and on May 17, they had begun refusing to do that, and petitions were being filed against them for contempt for their refusal. On May 27, at a hearing on the question of jurisdiction, it appeared that defendants relied on the General Drivers case (decided April 4, 1955), supra, which held that the carriers' truck drivers could not be required to cross *their own union's* picket line.

It appears that during the argument the Chancellor pointed out that that case differed from this case, and stated that he would not require a union man to cross his own union's picket line. Three days later, the carriers' truck drivers' own union, Local 327, all of them then under the injunction, set up its own picket line at the entrance to the plant alongside the picket line of the other union, Local 5003. These circumstances naturally

raise the question: Why was that action taken at that particular time?

Certain it is that Local 327 and its president, Don Vestal, understood and intended that their members, the truck drivers, would see Local 327's sign there and would understand that it was itself carrying on the picketing; and that if these drivers were unwilling to cross another union's picket line, they would be even more unwilling to cross their own union's picket line; and that this would either thwart the purpose of the court's injunction, or greatly multiply the difficulties of enforcing it.

It does not appear that Local 327 had ever communicated with complainant or with any of its office workers, or had expressed to any of them any desire or purpose to organize them or have any of them join Local 327; and the statement on the placard to that effect in the small type was not calculated to impart such information to them or to any member of the public. Also, it was shown that Mr. Vestal was in charge of Local 327, and if it had a good faith purpose to organize complainant's office workers, he doubtless would have so testified. But he did not take the witness stand.

On appeal from a conviction for contempt for violation of an injunction, an appellant, who seeks a reversal for insufficiency of the evidence, has the burden of convincing the appellate court that the evidence preponderates against the finding and judgment of the court below. Nashville Corp. v. United Steelworkers, etc., supra; State ex rel. Anderson v. Daugherty, 137 Tenn. 125, 191 S. W. 974; O'Brien v. State ex rel. Bibb. 26 Tenn. App. 270, 170 S. W. (2d) 931.

■ We think that appellants failed to carry this burden, and that the evidence does not preponderate against the finding and decree of the Chancellor, but fully sustains such finding and decree.

■ Appellants Local 327 and Vestal insist that the Chancellor's decree deprived them of their constitutional right of free speech. They were not peacefully picketing for a lawful purpose, but for a purpose in violation of the law of Tennessee. The constitutional guaranty of free speech does not extend to such unlawful picketing. Nashville Corp. v. United Steelworkers, etc., supra; Giboney v. Empire Storage and Ice Co., supra.

For these reasons, all of the assignments of error are overruled, the decree of the Chancellor is affirmed, and the cause is remanded to the Chancery Court for further proceedings not inconsistent with this opinion. The costs of the appeal are adjudged against appellants and the sureties on their appeal bonds.

Hickerson and Shriver, JJ., concur.