**MERCHANDISE WAREHOUSE CO., Inc.,**
a Corporation, Plaintiff,

v.

**A. B. C. FREIGHT FORWARDING CORP.; Chicago Express, Inc.; Huber & Huber Motor Express, Inc.; Indianapolis-Kansas City Motor Express Co.; Michigan Motor Freight Lines, Inc., Defendants.**

**No. IP 57-C-2.**

United States District Court
S. D. Indiana,
Indianapolis Division.

Aug. 14, 1958.

1. See, also, Hardin v. McAvoy, 5 Cir., 1954, 216 F.2d 399, 402.

Cadick, Burns, Duck & Neighbours, Indianapolis, Ind., by Floyd W. Burns and William E. Roberts, Indianapolis, Ind., for plaintiff.

Rosenfeld, Wolfe & Allen, by Robert G. Wolfe, Terre Haute, Ind., for defendants.

Nathaniel T. Helman, New York City, of counsel, for A. B. C. Freight Forwarding Corp.

HOLDER, District Judge.

The parties filed an agreed statement of facts which together with the admitted allegations contained in the pleadings comprise the facts upon which the case was submitted to the Court for decision of the issues of the pleadings.

The plaintiff during the period of time from October 22, 1956 through December 14, 1956 was engaged in the public warehousing business in the City of Indianapolis, Indiana. In the normal op-

eration of its business, it received and shipped a substantial part of the property of its customers by defendants' common carrier freight forwarder and motor common carriers, which included pickup and delivery service in accordance with their duly published tariffs.

The defendant, A. B. C. Freight Forwarding Corp., (hereinafter referred to as Freight Forwarder) during said period was doing business in Indiana and other states as a common carrier operating as a freight forwarder in interstate commerce under Part IV of the Interstate Commerce Act, 49 U.S.C.A. § 1001 et seq., pursuant to a permit issued by the Interstate Commerce Commission under Section 410 of the said Act. It assembled and consolidated, or provided therefor, shipments of property. It performed, or provided therefor, break-bulk and distributing operations of consolidated shipments of property. It assumed responsibility for the transportation of property and in providing therefor it utilized the services of carriers subject to Chapters 1, 8 or 12 of Title 49 of the United States Code Annotated. It admits that the acts or omissions of such carriers are the acts or omissions of itself.

All of the other defendants during said period (hereinafter referred to as Motor Common Carriers) were doing business in Indiana and other states as common carriers by motor vehicle transporting general commodities for compensation in interstate commerce pursuant to certificates of public convenience and necessity issued by the Interstate Commerce Commission under Part II of the Interstate Commerce Act, 49 U.S. C.A. § 301 et seq. Some of these defendants competed with one another. All of the motor common carriers were also operating under franchises granted by the Public Service Commission of Indiana pursuant to Indiana law.

The "over-the-road", and "city" drivers, and platform workers of the Motor Common Carriers were members of local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L.-C.I.O., the Indianapolis unit being Local Union No. 135. The employees of the contractor handling the cartage for the Freight Forwarder were also members of such Union.

During said period all of the defendants, pursuant to their tariffs, received at their Indianapolis terminals certain shipments of freight in interstate commerce consigned to plaintiff at Indianapolis, Indiana, and during said period the plaintiff had freight for transportation in interstate commerce by the defendants. The plaintiff requested the defendants to deliver and/or pick up said shipments and each defendant failed on one or more occasions at their docks to handle said shipments and make such delivery and/or pickup and from plaintiff, because of the said Union's picket line at plaintiff's properties or that the shipments were "hot cargo".

During said period the said Union had an established picket line at plaintiff's properties for the alleged purpose of compelling the plaintiff to recognize the union as the collective bargaining representative of the warehousemen employed by plaintiff. Litigation between plaintiff and the Union in the Superior Court of Marion County, the Appellate, and Supreme Courts of Indiana terminated the picketing on December 14, 1956. There was no violence, no threats of violence, and no probability of violence or threats thereof of any kind in connection with the said picket line. There was no mass picketing, nor was any attempt made at those premises during the picketing to block ingress and egress of plaintiff's properties.

During said period the managerial and supervisory personnel of the defendants directed their union employees at their docks to handle said shipments and to deliver and/or pick up said shipments of plaintiff who refused to cross the picket line at plaintiff's properties or on the grounds that the shipments were "hot cargo" as was the custom of the Union.

During said period no defendant declared any embargo against plaintiff.

All freight tendered to defendants at some point other than Indianapolis and consigned to this city was accepted by the defendants and transported to Indianapolis.

No defendant discharged or otherwise disciplined any of its employees for said failure to handle, deliver and/or pick up the shipments or to permit any one else to do so. Each defendant believed and it was probable that if its employees had crossed, or attempted to cross, the picket line such employee would have lost his union card or would be fined by said union. Each defendant believed and it was probable that they incurred a substantial risk of a strike by said Union if they had discharged or disciplined their employees for failure to perform said services, or if they had used their supervisory personnel or non-union labor to perform said services. The union employees of other carriers or freight forwarders would not service them, and it was probable the strike would encompass their entire nationwide systems.

During said period the defendants and the Union were operating under contract containing the terms and conditions of employment. Among the provisions of the contract is Article IX known as the Protection of Rights Clause and reads as follows:

"It shall not be a violation of this Contract and it shall not be cause for discharge if any employee refuse to go through the picket line of a Union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this Contract. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other Union; and reserve the right to refuse to accept freight from or to make pickups from or deliveries to establishments where picket lines, strikes, walk-outs or lock-outs exist.

"The term 'unfair goods' as used in this Article includes, but is not limited to, any goods or equipment transported, interchanged, handled, or used by any carrier, whether party to this Agreement or not, at any of whose terminals or at any of whose places of business there is controversy between such carrier or its employees on the one hand, and a labor union on the other hand; and such goods or equipment shall continue to be 'unfair' while being transported, handled or used by interchanging or succeeding carriers, whether parties to this Agreement or not, until such controversy is settled.

"The Union agrees that, in the event the Employer becomes involved in a controversy with any other Union, the Union will do all in its power to help effect a fair settlement.

"The Union shall give the Employer notice of all strikes and/or the intent of the Union to call a strike of any Employer and/or place of business, and/or intent of the members to refuse to handle unfair goods. The carriers will be given an opportunity to deliver any and all freight in their physical possession at the time of the receipt of notice. Any freight received by a carrier up to midnight of the day of the notification shall be considered to be in his physical possession. However, freight in the possession of a connecting carrier shall not be considered to be in the physical possession of the delivering carrier.

"The insistence by any Employer that his employee handle unfair goods or go through a picket line after they have elected not to, and if such refusal has been approved in writing by the responsible officials of the Central States Drivers Council, shall be sufficient cause for an immediate strike of all such Employer's operations without any

need of the Union to go through the grievance procedure herein."

The agreed interpretation of Article IX was as follows:

"1. The notice which the Union is required to give the Employer of strikes or the intent of the Union to call strikes or of refusal of members of the Union to handle 'unfair' goods does not have to be a written notice. An oral notice is sufficient.

"2. Such notice is required only with respect to strikes in which the Truck Drivers' Union is involved. It is not required in connection with strikes of other Unions.

"3. The provisions which gives the Carrier the opportunity to deliver any and all freight in its physical possession at the time of the receipt of the notices referred to above does not mean that the Carrier can require the employees to go through a picket line in disposing of such freight. If the employees refuse to do so, the Carrier must dispose of the freight in some other manner.

"4. The only written notice which is required under Article IX is the notice that comes from a responsible official of the Central States Drivers' Council after the employees have exercised their rights under Article IX, but the Company, nevertheless, insists that they go through the picket line or handle the unfair goods. No such written notice is required from the Central States Drivers Council until then."

Protection of Rights Clauses in one form or another have existed since November 1941 for a part of the Union's members and since March 1952 for the rest of the membership. And all members of local unions affiliated with said Union customarily refuse to cross the picket lines duly authorized by any of said Union's locals, and depending on the circumstances by other Unions.

During said period the Motor Common Carriers were parties to various published tariffs on file with the Interstate Commerce Commission applicable to said shipments of the plaintiff. The identity of the applicable tariff depended upon the point of origin of the shipment. All of the tariffs contained a clause known as an "impractical operations" clause. The clause of the Central States Motor Freight Bureau, Inc. and the two clauses of the Eastern Central Motor Carriers Association, Inc. are as follows:

"Nothing shall require the carrier to perform pickup or delivery service at any location from or to which it is impracticable to operate vehicles because of:

"(1) The conditions of the roads, streets, driveways, alleys or approaches thereto;

"(2) Inadequate loading or unloading facilities;

"(3) Any riot, strike, picketing or other labor disturbance.

"No pickup or delivery service or loading or unloading service will be given where strikes, picketing, riots, labor disputes or disturbances or other civil commotion or military actions prevents or interferes with the safe and peaceful performance of such service, nor in any condition where roads, streets, alleys, yards or obstructions on shipper's or consignee's premises to be traversed make it impractical, unsafe or impossible to render such service.

"Where strikes, picketing, riots, or other labor disturbances, or where conditions of streets, roadways, alleys, yards or the exterior or interior of premises make it impracticable, unsafe or impossible to render pickup or delivery service, such service will not be given."

During said period the Freight Forwarder had a published tariff on file with the Interstate Commerce Commission applicable to shipments of the plaintiff. The tariff contained a clause known

as an "impractical operations" clause which is as follows:

"Where strikes, picketing, riots, or other labor disturbances, or where conditions of streets, roadways, alleys, yards or the exterior or interior of premises make it impracticable, unsafe, or not reasonably possible to render service or any part thereof under this tariff, or any tariffs referring to or referred to by this tariff, then such service will not be given."

The freight which the defendants did not service during said period is as follows:

| | |
|---|---|
| A. B. C. Freight Forwarding Corp. | 5,306 lbs. |
| Chicago Express, Inc. | 19,366 lbs. |
| Huber & Huber Motor Express, Inc. | 1,078 lbs. |
| Indianapolis Forwarding Company | 25,945 lbs. |
| Indianapolis-Kansas City Motor Express Co. | 1,007 lbs. |
| Michigan Motor Freight Lines, Inc. | 29,590 lbs. |
| Total | 82,292 lbs. |

———◆———

And lastly it was stipulated and agreed that in the event the Court determined the defendants have breached their duties under the law to serve plaintiff then it shall then recover as damages from defendants, jointly and severally, the sum of $1,000, together with the costs of the action.

The issues of the pleadings are presented by: counts one and three of the plaintiff's amended complaint filed February 27, 1957, count one included all of the defendants except A. B. C. Freight Forwarding Corp. and count three included all of the defendants, the separate answer of five defenses to the third count filed March 5, 1957 by A. B. C. Freight Forwarding Corp., and the joint answer of five defenses to count one and three and a sixth defense to count three filed March 5, 1957 by the other defendants.

Count one of the amended complaint proceeds against the Motor Common Carrier defendants on the theory that since October 22, 1956 they were common carriers subject to Part II of the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq. and refused to handle shipments of freight of the plaintiff in interstate commerce contrary to Section 316(b) and (d) of the Act to the damage of the plaintiff in the sum of $50,000.

Count three of the amended complaint proceeds against all of the defendants on the theory that since October 22, 1956 the Motor Common Carrier defendants and the Freight Forwarder defendant were common carriers for hire under the common law and obligated to transport all freight which they held themselves out to transport, all of whom refused to handle shipments of freight of the plaintiff in interstate commerce contrary to their obligation to do so under the common law to the damage of the plaintiff in the sum of $50,000. It further alleged facts showing diversity of citizenship between plaintiff and all of the defendants and that the matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

The fifth defense of the Freight Forwarder to count three and the sixth defense of the Motor Common Carrier defendants to count three is in the nature of a Motion to Dismiss by asserting that count three of the amended complaint fails to state a claim against the defendants upon which relief could be granted. These defenses are not supported by briefs contrary to the provisions of the local rules of this Court. Based upon the allegations contained in counts one and three alternative causes of actions are stated against the Motor Common

Carrier defendants and against the Freight Forwarder in count three and these defenses are denied and overruled.

The fourth defense of the Freight Forwarder to count three adopts all of the averments of its first, second and third defenses to count three and asserts the Court has no jurisdiction of the subject matter of this answer. Obviously this is an uncorrected error and the fourth defense is denied and overruled.

The first defense of the Motor Common Carrier defendants to count one and the first defense of the Motor Common Carrier defendants and the first defense of the Freight Forwarder to count three are that of admitting, denying, or without knowledge of the alleged facts.

Certain of the allegations of the remaining defenses are useless as issues since certain facts have been agreed upon. The agreed damages eliminates all issues of fact thereof. The Freight Forwarder's agreed admission that the acts or omissions of its independent contractor are deemed its acts or omissions eliminates the issue of fact and law of the independent contractor acts or omissions raised by one of its defenses. The agreed fact that all of defendants failed to service plaintiff eliminates certain issues of fact.

Eliminating from the defenses those facts that are no longer in issue because of the agreed facts, the defenses are briefly;

The second defense of the Motor Common Carrier defendants to counts one and three and the second defense of the Freight Forwarder to count three are in substance as follows:

During the period in question a picket line was instituted at plaintiff's premises by Local Union No. 135 affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. While the defendants did not serve the plaintiff it was because of circumstances beyond their control as their employees, who were members of said Union, failed or refused to cross the picket line or to handle plaintiff's freight. No embargo was imposed or declared by defendants against plaintiff. The defendants did not refuse to and were willing and able to provide service to plaintiff had it not been for the circumstances created by the conduct of its Union employees. The conduct of the Union employees of defendants was the proximate cause of defendants' failure to serve plaintiff. The defendants believed that a substantial risk existed in that they would face a strike which would have prevented them from serving the public generally. The Motor Common Carrier defendants were not negligent but employed diligence to furnish service to plaintiff to the point that it appeared probable that additional efforts, or continued attempts to service plaintiff would result in a work stoppage of their Union employees.

The third defense of the Motor Common Carrier defendants to counts one and three is as follows:

The Motor Common Carrier defendants were parties to contracts with the Union. All of their contracts contained a clause "Article IX", and known as the "Protection of Rights" clause which is set forth in the agreed facts.

The fourth defense of the Motor Common Carrier defendants to counts one and three and the third defense of the Freight Forwarder to count three are as follows:

The defendants had tariffs on file with the Interstate Commerce Commission applicable to all commodities including the freight of plaintiff's. The applicable tariffs depended upon the area from which the shipment originated. All of the tariffs contained a so-called "impractical operations" clause which are quoted in the agreed facts.

The fifth defense of the Motor Common Carrier defendants to counts one and three is as follows:

The Court does not have jurisdiction of the subject matter of the action based upon the allegations of their first, second, third and fourth defenses to counts

one and three, which are adopted as part of the defense.

On the facts the Court concludes the issues for plaintiff.

The Court has jurisdiction of this action under 28 U.S.C.A. §§ 1332 and 1337.

The defendants are quasi public servants exercising a function not merely for their own pecuniary gain but for the convenience and necessity of the general public. The law requires of them greater responsibility than a non-public enterprise. They cannot choose their patrons to the exclusion of others and they are obligated to serve the general public equally. If they fail in this duty they are liable in damages to the injured member of the public. The authorities are numerous establishing the special duty of the defendants at common law.

The Congress of the United States, in order to establish a uniform transportation policy for the country, enacted the Interstate Commerce Act in 1887. Part II of the Act, regulating transportation by motor carriers, was added in 1935, and later amended. Part IV of the Act, regulating freight forwarders was added in 1942. The Act was adopted in light of the long history and high standard of duty placed upon common carriers by the common law.

The Motor Common Carrier defendants operated in interstate commerce and were subject to the Act. 49 U.S.C.A. § 316(b) and (d) concerns their duty to plaintiff and is quoted in part as follows:

"(b) It shall be the duty of every common carrier of property by motor vehicle to provide safe and adequate service, equipment, and facilities for the transportation of property in interstate * * * commerce; * * *, and just and reasonable regulations and practices relating thereto and to the manner and method of presenting, * * *, and delivering property for transportation, the facilities for transportation, and all other matters relating to or connected with the trans-

portation of property in interstate * * * commerce * * *

"(d) * * *. It shall be unlawful for any common carrier by motor vehicle engaged in interstate * * * commerce to make, give, or cause any undue or unreasonable preference or advantage to any particular person, * * *, in any respect whatsoever; or to subject any particular person, * * * to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever; * * *."

The Freight Forwarder defendant operated in interstate commerce and was subject to the Act. 49 U.S.C.A. § 1004 (a) and (b).

Clearly these defendants have breached their duty to this plaintiff. Under the agreed facts they received at their terminals shipments of freight consigned to plaintiff; they each failed on one or more occasions to deliver such to plaintiff; they failed to heed plaintiff's oral and/or written demands to deliver such freight to plaintiff at its premises or at defendants' premises; they failed on one or more occasion to pick up freight from plaintiff for transportation in interstate commerce at the oral and/or written request of plaintiff; in two instances, possession of such inbound shipments was obtained by plaintiff by replevin action and process served by the Sheriff of Marion County, Indiana; they, in many instances, received tendered shipments of plaintiff at their terminal for interstate shipment which were not transported for a long period of time; all to the damage of plaintiff. Galveston Truck Line Corp. v. Ada Motor Lines, Inc., et al., No. MC C-1922, (I.C.C. December 16, 1957); Quaker City Motor Parts Co. v. Inter-State Motor Freight System, D.C.1956, 148 F.Supp. 226; Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Ry. Co., D.C.1952, 105 F.Supp. 794; 8 Cir., 1954, 215 F.2d 126; Montgomery-Ward & Co. v. Northern Pacific Terminal Co., D.C. 1953, 128 F.Supp. 475; D.C., 128 F.Supp.

520; Wabash Railroad Co. v. Pearce, 1904, 192 U.S. 179, 48 L.Ed. 397, 24 S.Ct. 231, 48 L.Ed. 397; Hannibal & St. Joseph R. Co. v. Swift, 1871, 12 Wall. 262, 20 L.Ed. 423; New Jersey Steam Navigation Co. v. Merchants' Bank, 1848, 6 How. 344, 47 U.S. 344, 12 L.Ed. 465; Lane v. Cotton, 1 Ld. Raymond 464, 91 Eng.Rep. 1332; 9 Am.Jur., Carriers, § 286; 13 C.J.S. Carriers § 27.

Defendants would excuse their breaches of duty as common carriers by asserting the various defenses.

■ They assert, in the absence of contract, that it was customary for the Union to refuse to cross a picket line or for its dock workers to handle freight of an establishment so picketed. Under the agreed facts there was no violence or threat of violence and employees of the defendant corporation have no right as agents of the common carrier to divert from the duty of their principal. The corporation defendants are responsible for the acts and omissions of their employees. The defendants are obligated to maintain discipline of their employees to fulfill their duty as common carriers. The custom of the Union can in no way abridge the statutory and common law duty of defendants. Aladdin Industries, Inc., v. Associated Transport, Inc., Tenn. App.1956, 298 S.W.2d 770; Toledo A. A. & N. M. Ry. Co. v. Pennsylvania Co., C.C.1893, 54 F. 730, 19 L.R.A. 387, 394; 13 Am.Jur. page 1043; 19 C.J.S. Corporations § 1260; National Labor Relations Board v. Columbia Products Corporation, 2 Cir., 1944, 141 F.2d 687; 35 Am.Jur., page 514; 56 C.J.S. Master and Servant § 62.

■ They then assert that they were under contract with the Union which contained a "Protection of Rights" clause. This voluntary act of defendants without the consent of the general public including plaintiff, in no way shields the defendants from their duty to plaintiff or their breach thereof. Burlington Transportation Co. v. Hathaway, 1943, 234 Iowa 135, 12 N.W.2d 167, 149 A.L.R. 1238; Beck & Gregg Hard-

ware Co. v. Cook, 1954, 210 Ga. 608, 82 S.E.2d 4; General Drivers, Warehousemen and Helpers, Local Union No. 89 v. American Tobacco Co., Ky.1954, 264 S.W.2d 250, reversed, 1955, 348 U.S. 978, 75 S.Ct. 569, 99 L.Ed. 762; Montgomery Ward & Co. v. Northern Pacific Terminal Co., D.C.1953, 128 F.Supp. 475, D.C., 128 F.Supp. 520; Quaker City Motor Parts Co. v. Inter-State Motor Freight System, D.C.1956, 148 F.Supp. 226.

■ Next they assert that they did not refuse and were willing to serve had it not been for the conduct of their Union employees, thus, distinguishing the corporation from its employees. Under the agreed facts this is not the facts of the case. The defendant corporations in effect entered into a solemn contract with the Union to the effect that their employees were not required to service plaintiff if the Union picketed plaintiff's business. The blame must be placed on defendants as the refusal of their Union employees was the result of the voluntary contract of the defendants.

■ Next they assert that if they had used other employees than the Union employees to fulfill their duty to service the plaintiff it was probable that they faced a strike of their own, possibly system wide, by the Union and such would disastrously affect the general public and not just plaintiff. This argument is unsound. It is based on probability and it seeks to blame the Union when defendants voluntarily entered into a contract recognizing the Union as the collective bargaining representative of their drivers, warehousemen, dockmen and helpers and agreed to the provision for a union shop. Article II, Section 3 of the contract provides that the work shall be done by employees who are members of the Union. The defendants negotiated and contracted themselves into the probability of a strike. The rights of plaintiff and the general public cannot be compromised without its being a party thereto. Galveston Truck Line Corp. v. Ada Motor Lines, Inc., et al.,

No. MC C-1922 (I.C.C. December 16, 1957). The defendants would not have been in this dilemma if they had not agreed to Clause IX of the Union contract. They then could have asserted their rights under Section 301 of the Labor Management Relations Act of 1947 (Taft-Hartley Act) 29 U.S.C.A. § 185.

Lastly they assert that the "impractical operations" clause of their tariffs avoided their duty to plaintiff and liability in damages. A picket line per se is not sufficient to bring into application the "impractical operations" clause of their tariffs. There must be a situation at the picket line that reasonable men would consider a real and substantial danger to justify the defendants' failure to service the plaintiff under the provisions of said clause. Under the agreed facts there was no violence, no mass picketing and no attempt to block the entrance to plaintiff's establishment. This defense fails. Meier & Pohlmann Furniture Co. v. Gibbons, 8 Cir., 1956, 233 F.2d 296; Beck & Gregg Hardware Co. v. Cook, 1954, 210 Ga. 608, 82 S.E.2d 4; Consolidated Freight Lines v. Department of Public Service, 200 Wash. 659, 94 P.2d 484; Montgomery Ward & Co. v. Northern Pacific Terminal Co. of Oregon, D.C.1953, 128 F.Supp. 475; 128 F.Supp. 520.

The defendants discuss in their brief adjudicated cases which they say express "judicial apprehension" of labor union encroachment on the duty of the common carrier to the public. They say these cases make the defendants "Executioneers for the State". They wince and flinch over their burden of dealing contractually with the Union and their duty as common carriers to the public. If the defendants' theory were adopted in this case this Court would be a party to the execution of the state and the rights of many individuals including the plaintiff as citizens thereof. The defendants must face its burdens and insist upon contractual terms with the Union that will permit them to fulfill their duties as common carriers and as a freight forwarder.

Findings of facts and conclusions of law were separately filed and judgment rendered thereon for the plaintiff against all of the defendants.